1

2

3

4

5

6

7

8

9

10

# UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF CALIFORNIA

11  ERIK FABIAN,                              )        1:07-CV-0737 AWI JMD HC
                                             )
12                    Petitioner,            )
                                             )        FINDINGS AND RECOMMENDATION
13        v.                                 )        REGARDING PETITION FOR WRIT OF
                                             )        HABEAS CORPUS
14                                           )
    TOM FELKER,                              )
15                                           )
                      Respondent.            )
16  _____ )

17

18        Petitioner is a state prisoner proceeding with a petition for writ of habeas corpus pursuant to

    28 U.S.C. § 2254.

19

20                                   **BACKGROUND**

21        Petitioner is currently in the custody of the California Department of Corrections pursuant to

    a judgment of the Fresno County Superior Court.  A jury convicted him of first degree murder and

22  found true the gang and firearm use allegations.  The trial court sentenced him to fifty years to life in

23  state prison.  (Answer at 1-2.)

24        Petitioner filed an appeal in the California Court of Appeal.  The court affirmed the judgment

25  in a reasoned opinion.  (Answer at 2; Lodged Docs. 1-3.)

26        Petitioner filed a petition for review in the California Supreme Court.  The court summarily

27  denied review.  (Answer at 2; Lodged Doc. 4.)

28

1    On May 18, 2007, Petitioner filed the instant petition in this Court.  The sole ground

2    presented is that Petitioner's rights were violated when the jury was allowed to hear evidence of

3    statements made to police by a co-defendant whom Petitioner did not have the opportunity to cross-

4    examine.

5    On February 6, 2008, Respondent filed an answer to the petition.

6    On March 7, 2008, Petitioner filed a traverse to the answer.

7                          **FACTUAL BACKGROUND**[1]

8    <u>        Precipitating Events</u>

9    During October 1999 Arcadio and Lucas lived in a two-bedroom house with a fenced yard in

10   Fresno.  Arcadio tagged the house's fence with the Bulldog gang logo and his personal gang moniker.

11   Arcadio and Lucas shared the house with their uncles Gregorio and Ruben Manzana (Gregorio and

12   Ruben) plus Arcadio's girlfriend, Caratina Gonzales (Caratina), and their young children.  Arcadio's

13   family slept in one of the bedrooms and Ruben slept in the other bedroom.  Lucas customarily slept

14   in the living room.  Gregorio slept in a trailer parked outside the house.

15   An alley runs between the house's backyard and a nearby apartment building.  Elizabeth Rios

16   (Rios) lived in an apartment in this building.

17   Rios hosted a party at her apartment on October 3.  Some of the guests were Surenos gang

18   members.  Petitioner and Torres attended the party.  Torres parked his blue Thunderbird in the alley.

19   Arcadio and a friend went into the alley to see if they could "hang out" at the party.  Arcadio

20   recognized Torres, Petitioner, and other people who he knew were Surenos.  Arcadio began arguing

21   with some of the guests, including Torres.  The confrontation escalated and some of the guests threw

22   things into Arcadio's backyard.  Arcadio threw something through a window of the Thunderbird,

23   breaking it.

24   Arcadio went inside the house and retrieved a .38-caliber handgun.  While standing in the

25   backyard, he fired several shots into the air.  He went back inside the house and retrieved a rifle.

26   Again, he stood in the backyard and fired several shots into the air.  Caratina pulled Arcadio into the

27

28   _____

[1]  The facts are derived from the factual summary set forth by the California Court of Appeal in its opinion of October 31, 2005.  (Lodged Doc. 3.)

1   house.

2          Torres testified later that evening Petitioner called Arcadio "a pussy" because he fired into

3   the air.  Petitioner said that "[h]e wouldn't shoot at the air."  At the preliminary hearing, Torres

4   testified when a rival gang member breaks a window, the expected response is to "get back at them."

5          Juan Carlos Santa Maria (Santa Maria) testified he was involved in Surenos gang activity.

6   Bulldogs and Surenos are rivals.  Santa Maria attended a party prior to the homicide during which

7   Petitioner told him about the October 3 altercation.  Petitioner said he wanted to "get back" at the

8   Bulldog who fired into the air.  He asked Santa Maria to get him a gun.  Petitioner said "he would

9   take the blame for whatever happened."  Santa Maria did not get Petitioner a gun.

10         Miguel Coronado (Coronado), a Surenos gang member and a convicted felon, testified that

11  prior to the homicide he had a conversation with Petitioner about the altercation with Arcadio.

12  Petitioner said "they were going to get back at somebody for breaking the window."

13         The Homicide

14         Ernesto Almarez (Almarez) hosted a party on the evening of October 12.  Torres, Petitioner,

15  Coronado, Ruth Huizar (Huizar), and Cristella Ochoa (Ochoa) attended the party.  Some of the

16  guests were drinking and smoking "KJ," which is a PCP-laced cigarette.  Torres testified Petitioner

17  was drinking and smoking KJ and rock cocaine.  A group of people, including Torres and Coronado,

18  left the party on two occasions to steal beer.

19         Torres testified that as the evening progressed, Petitioner and Almarez began talking about

20  retaliating against Bulldog gang members.  Almarez said he wanted to "get some Bulldogs."

21  Petitioner wanted to use Huizar's car to find some Bulldogs.  Petitioner said his "blood was up" and

22  he wanted to "shoot some Dogs."

23         Torres testified that he and Almarez left the party on foot to search for some Bulldog gang

24  members.  Torres does not recall whether Petitioner was with them.  They stopped at an apartment

25  complex on Mariposa Street.  Almarez threw something through a window of an apartment where he

26  believed a Bulldog gang member lived.  Huizar drove up in her white Ford Explorer.  Coronado and

27  other Surenos gang members were in the Explorer.  Torres and Almarez got in the vehicle and

28  Huizar drove away.

Monique Avila testified a bottle was thrown through the window of an apartment she shared with her husband.  She looked outside and saw three Hispanic males kicking parked cars and yelling. A white sport utility vehicle stopped and picked them up.  She telephoned the police.  Police records indicate an officer responded to her call around 3:00 a.m.

Torres testified they saw a man on Mariposa Street who they believed was a Bulldog gang member.  Huizar stopped the Explorer and the passengers got out and chased the man away. Almarez smashed a car window, cutting his hand.  As they were driving away, "some guys came out."  Petitioner said he wanted to "[c]ome back and shoot those Dogs."  Petitioner wanted Huizar to take him to "Ninth Street" to get a gun.  Huizar dropped Petitioner and Torres off at Ricardo Nunez's (Nunez) house on Ninth Street.  Ochoa and Coronado went to Ochoa's house, which is located on the same block.

Huizar testified that she left the party and drove Torres, Petitioner, Ochoa, Coronado, and two others to Ninth Street.  She dropped off Ochoa and Coronado at Ochoa's house and then drove to another house on the same block.  Everyone got out of the car.

Torres and Petitioner knocked on Nunez's front door, waking Nunez who was sleeping on a couch.  Calderon was sleeping in a bedroom.  Before going back to sleep, Nunez heard Petitioner ask Calderon for a ride somewhere.  Nunez testified Petitioner did not appear drunk or high.

Torres testified that when he entered the bedroom Petitioner was talking with Calderon "about Dogs."  Petitioner said he was going to let the Bulldogs know "where the shots were coming from."  Torres understood this to mean if Petitioner "shot them, he was going to let them know he was a Sureno."  Torres shook his head "no" because he did not want Calderon to give Petitioner a gun.

Both Huizar and Coronado testified they saw Petitioner, Calderon, and Torres leave Nunez's house in a blue Thunderbird.  Calderon was driving.  Petitioner was in the front passenger seat. Torres was in the backseat.

Torres testified Calderon was driving the Thunderbird because he had traded cars with Calderon shortly after the October 3 altercation.  Petitioner repeatedly asked Calderon for a gun. Calderon drove to his mother's house.  He went inside and returned a few minutes later carrying a

1   chrome handgun.  (Torres previously saw Calderon with this gun at a Foster's Freeze restaurant.

2   Torres said Calderon hid the gun in a crawl space under Nunez's house.)

3        Calderon handed the gun to Petitioner.  Petitioner asked whether the bullets were "clean,"

4   meaning free of fingerprints.  Calderon confirmed that the bullets were clean.  Torres heard a click

5   and saw that a bullet was jammed in the gun.  Petitioner removed the jammed bullet and it fell on the

6   car's floorboard.

7        Calderon drove toward the location on Mariposa Street where Almarez broke the car window

8   and cut his hand.  Torres understood that Petitioner planned to shoot at Bulldog gang members when

9   they reached Mariposa Street.  The trio spotted Huizar's car and saw that it had been stopped by a

10  patrol vehicle.  Calderon circled the block and they observed that the male occupants of the Explorer

11  were being arrested.  Petitioner said, "Let's go get that fool that broke the window."  By this

12  statement, Torres understood Petitioner planned to shoot the Bulldog gang member who broke the

13  Thunderbird's window, instead of shooting "at the Dogs at Mariposa."

14       Huizar testified she was stopped by a sheriff's deputy while she was taking Torres's younger

15  brother home.  All the male passengers were arrested.

16       Police records indicate Huizar's Explorer was stopped at 3:36 a.m.

17       Torres testified Petitioner directed Calderon to the alley behind Arcadio's house.  Calderon

18  stopped the car.  Torres and Petitioner got out of the car.  Calderon remained in the car, with the

19  stereo playing.  Torres urinated on the ground and lost sight of Petitioner.  Torres heard two or three

20  gunshots.

21       Petitioner got back in the car.  Torres testified Calderon talked with Petitioner about what

22  happened in the house.  Petitioner said he "got him in the head."  Petitioner said he shot the guy who

23  broke the window.  Petitioner said the person was in the living room.  Calderon asked Petitioner how

24  he knew he shot the right person.  Petitioner described the person he shot as bald.  Torres explained

25  that "telling us that he was bald, that ... was telling us that he was a gang member."

26       Calderon stepped on the gas to leave the alley and "peel[ed] out."  Torres could feel the tires

27  getting stuck in the dirt and spinning.

28       Both Ruben and Gregorio were awakened by a noise that sounded like something striking

1    wood.  Gregorio heard the sound of a car's wheels spinning out.  Ruben got up to investigate.  He

2    noticed that the back door was open and he went outside into the alley, but he did not see anything.

3    When Ruben returned to the living room he heard Lucas making a choking sound.  Noticing blood,

4    he called for Arcadio and Caratina.  Emergency assistance was summoned at 3:47 a.m.

5              Events after the Homicide

6          Torres testified that after leaving Arcadio's house Calderon drove to a nightclub but it was

7    closed.  They returned to Ninth Street.  Calderon hid the gun in a yard that was full of cars.  Calderon

8    looked in the Thunderbird for the bullet that had fallen on the floorboard.  He found the bullet and

9    threw it into the street.

10         Coronado testified Petitioner, Torres, and Calderon arrived at Ochoa's house about 30

11   minutes after he saw them drive away in the Thunderbird.  As Coronado approached the car, he saw

12   two of them searching for something in the car.  From their conversation, Coronado learned they

13   were searching for a bullet shell.

14         Calderon drove Coronado and Ochoa to Coronado's house.  Petitioner accompanied them.

15   Coronado testified Petitioner said to him, "if we get pulled over, don't say anything."  Petitioner also

16   said, "if we get pulled over, you guys know nothing."  Calderon told Coronado if a gun was

17   recovered either his or Petitioner's fingerprints would be on it.  He did not say Torres's fingerprints

18   would be on the gun.  Ochoa testified Calderon seemed "real nervous."

19         Calderon, Torres, and Petitioner spent the rest of the night at Calderon's cousin's house.

20   Calderon drove Torres home later that morning.  Torres told his brother, Everaldo, that he and

21   Petitioner "had shot a Dog," meaning a Bulldog gang member.

22         Torres and Petitioner went to work later that day.  A coworker told Torres that the police

23   were looking for him because a little boy had been murdered.  Torres testified when Petitioner

24   learned he shot a child, he said "[I] fucked up."

25         Torres telephoned Huizar at her workplace that day.  Huizar heard Petitioner in the

26   background telling Torres to tell her to lie about their whereabouts on the night of October 12 and

27   say she had driven them to the west side of Fresno.  At that time, Huizar did not know Lucas had

28   been murdered.  Huizar subsequently lied to Detective George Von Euw as directed by Petitioner

1   and Torres.

2       Torres testified he and Petitioner discussed going to Mexico.  He went to Huizar's workplace

3   and told her he was leaving and asked for some money.  Huizar later gave him between $400 and

4   $600.  Huizar denied giving Torres any money.

5       Petitioner and Torres went to see Petitioner's cousin.  They asked him for a ride to Tijuana.

6   Petitioner told him the police were looking for Torres because he shot Lucas.  Torres did not

7   contradict Petitioner.

8       Torres and Petitioner picked up Huizar after she finished her shift and they went to a motel.

9   Huizar testified that she rented a room so they could watch television news broadcasts about the

10  murder.  While feigning sleep, she overheard Petitioner tell Torres "that he just went in and just did

11  everything without thinking."  Petitioner said "[t]hat he didn't mean to kill a little boy."

12      Torres testified that at some point prior to his arrest, he was alone in a room with Calderon

13  and Petitioner.  Petitioner said the gun had to disappear.  Calderon said "[h]e was going to get rid of

14  the gun."

15  Petitioner's Arrest

16      Petitioner was arrested during the morning of October 20 at an apartment rented by Juan

17  Rocha (Rocha), a Surenos gang member.  Rocha told Fresno Police Officer Douglas Stokes that

18  Petitioner and some friends had arrived around midnight.  Petitioner spent the night.  Rocha slept on

19  the couch and Petitioner slept in the bedroom.

20      When Petitioner was placed in the patrol car he was dressed only in boxer shorts and socks.

21  Officer Stokes asked Petitioner if he had any clothing in the apartment.  Officer Stokes found the

22  shirt, jacket, and blue jeans Petitioner described to him.  The belt loops of the jeans held a belt with a

23  buckle in the shape of an S.

24      Officer Stokes found two pairs of shoes in the apartment.  A pair of low-top Nike brand

25  tennis shoes (the Nikes) was on the bedroom floor next to Petitioner's jeans.  A pair of white high-

26  top tennis shoes (the high tops) was in the living room by the couch.  The officer asked Rocha which

27  pair of shoes belonged to him.  Rocha identified the high tops and pointed out paint marks on the

28  shoes to show that he had worn them in the paint shop where he works.  The officer asked Petitioner

1   if either pair of shoes belonged to him.  Petitioner said that the high tops belonged to him.  When

2   Officer Stokes told Petitioner that Rocha said the high tops belonged to him, Petitioner replied that

3   he arrived at the apartment wearing broken sandals.  Rocha's brother loaned him the high tops.

4   Officer Stokes testified that he went back into the apartment and searched for a pair of sandals but

5   did not find them.

6        Petitioner was interviewed after his arrest by Fresno Police Detective George Von Euw.  He

7   denied any knowledge about the homicide.  He said Huizar dropped off Torres and him by the

8   California Market on "the west side" of Fresno about 1:00 a.m.  They visited a friend named

9   Armando.  The audiotape of this interview was played for the jury.

10  <u>Physical Evidence</u>

11       Dr. Venu Gopal performed the autopsy.  He determined that Lucas died as a result of three

12  gunshot wounds to the head.  The shots were fired from a distance of more than 24 to 30 inches.  Dr.

13  Gopal recovered two expended bullets from Lucas's head.  Lucas was 5'2" tall and weighed 144

14  pounds.  He looked older than his actual age.

15       Three expended .25-caliber shell casings were found in the living area where Lucas had been

16  sleeping.  A copper jacketed bullet was recovered from Lucas's pillow.

17       An expended .22-caliber shell casing was found in the backyard and another was found inside

18  the floor furnace.

19       A partial shoe track with a herringbone pattern was located in the backyard and another

20  partial shoe track with a herringbone pattern was found in the front yard.  A partial tire track was

21  located in the alley with a shoe impression on top of it.

22       Criminalist Stephen O'Clair determined the two expended bullets recovered from Lucas's

23  head and the bullet found on Lucas's pillow were all fired from the same firearm.  These bullets are

24  consistent with the .25-caliber cartridge casings found in the living room.  The tire impression from

25  the alley is consistent with the Thunderbird's tires.  The soles of the Nikes have a herringbone pattern

26  that corresponds with the shoe impressions found at the crime scene.

27  <u>Police Investigation/Statements made to Detective Von Euw</u>

28       Detective Von Euw spoke with Huizar on October 13 at her workplace.  Huizar lied to him as

U.S. District Court
E. D. California        Jp

8

1   she had been told to do by Torres and Petitioner.

2      Torres was interviewed on October 15.  He said that after leaving the party he spent the night

3   at an apartment on the west side of Fresno.

4      Huizar and Calderon were interviewed at the police station on October 19; they were not

5   arrested.  After Huizar was warned about being an accessory to murder, she told Detective Von Euw

6   about the conversation she overheard between Petitioner and Torres in the motel room.

7      Calderon told Detective Von Euw he was sleeping at Nunez's house when Torres awakened

8   him about 3:00 a.m.  He drove Torres and Petitioner to the alley.  Torres got out of the car to urinate.

9   Calderon spun the tires when he drove away from the alley.  Calderon denied seeing a gun or bullets.

10  After redaction to eliminate references to Petitioner, the audiotape of this interview was played for

11  the jury.

12     Torres was arrested on October 19.  After he was confronted with Huizar's and Calderon's

13  statements he admitted that he was at the alley that night but said he did not get out of the car.

14     Calderon was interviewed a second time on October 22.  Detective Von Euw testified

15  Calderon admitted retrieving a gun before driving to the alley.

16     Calderon was arrested without incident on October 25.  Detective Von Euw interviewed him

17  a third time.  Calderon told Detective Von Euw that he retrieved a .25-caliber semiautomatic

18  handgun from his parents' backyard and gave it to Petitioner.  He drove to the alley around 3:00 or

19  4:00 a.m.  Calderon said Petitioner got out of the car and went through a gate into the backyard.

20  Torres stepped out of the car to urinate.  Petitioner came back and got into the car.  Petitioner did not

21  give the gun back to him.  Calderon does not know what happened to the gun.  He did not admit

22  hearing any gunshots.  Petitioner said he was "going for money."  Calderon did not ask Petitioner

23  why he needed a gun.  A redacted audiotape of this interview was played for the jury during the

24  prosecution's case-in-chief.  An unredacted audiotape was played during the prosecutor's rebuttal.

25     Detective Von Euw testified that he interviewed Nunez (on an unspecified date).  Nunez told

26  him he was at "21's" house two or three days after the shooting.  Petitioner, Calderon, Torres, and

27  others were present.  Nunez overheard Petitioner say he did not mean to shoot the boy and that the

28  boy's head was covered with a blanket on the floor of the living room.  At trial, Nunez denied

1    making these statements.

2         Lorenzo Salas, a fellow Surenos gang member, was Petitioner's cellmate after his arrest.

3    Salas wanted to make a deal in the case pending against him.  To this end, he was interviewed by a

4    deputy district attorney and Detective Von Euw on November 24.  Detective Von Euw testified Salas

5    told them that Petitioner said he kicked Lucas, started to walk away, and then went back and shot

6    him in the head two or three times with a .25-caliber pistol.  Petitioner said he shot the victim from a

7    distance of three to five feet.  Petitioner said the person he shot looked bigger than a boy.  Calderon

8    gave him the gun.  He gave it back to Calderon after the shooting and Calderon disposed of it.

9    Torres and Calderon did not want to go at first and he had to talk them into it.  Salas testified he did

10   not remember what he said during this interview.  No deals were made with Salas for his interview

11   or testimony.

12        Additional Gang Evidence

13        Fresno County Sheriff's Deputy John Martinez conducted a traffic stop on October 15.

14   Petitioner and Torres were passengers.  They lied about their identity, giving false names to the

15   deputy.  Petitioner told the deputy he claimed Surenos gang membership.  Deputy Martinez qualified

16   as a gang expert and opined Petitioner was an active gang member on that date.

17        On October 20, Petitioner told Detective Von Euw he was not a Surenos gang member any

18   longer.

19        During his October 25 interview with Detective Von Euw, Calderon said he was a Surenos

20   and his gang name was Chuco.  He explained that his tattoos reflected his Surenos affiliation.

21        Detective Von Euw testified Nunez told him Calderon was a Surenos gang member and had

22   gang tattoos.

23        Fresno Police Officer Michelle Ochoa testified as a gang expert.  She opined that the Surenos

24   organization was a criminal street gang within the meaning of the gang enhancement statute.  There

25   are various subsets of the Surenos gang in the Fresno area.  However, the existence of subsets does

26   not change the overall Surenos structure as a criminal street gang.  She identified two predicate

27   offenses committed by Surenos gang members.

28        Officer Ochoa opined that Petitioner and Calderon were both Surenos gang members and

1    identified numerous factors supporting this opinion, including their self-identification as Surenos

2    gang members, their association with other Surenos gang members, and their gang-related tattoos.

3           Also, Officer Ochoa opined that the homicide was probably motivated by gang activity.

4    Retaliation between rival gangs is common.  There is a continuing rivalry between Surenos and

5    Bulldogs.

6           Parole Agent Sharon Main testified that records from the California Youth Authority (CYA)

7    indicate Petitioner claimed to be a member of the Pomona Locos subset of the Surenos gang.

8           <u>Defense</u>

9           Petitioner presented an unconsciousness defense based on PCP ingestion.  Calderon's defense

10   was based on lack of knowledge and lack of intent to facilitate a crime.  Both asserted that Torres,

11   Huizar, and Coronado were untruthful.  Petitioner's counsel argued during summation that Torres

12   was the shooter.

13          Petitioner testified that he attended a party on October 3.  When a man began firing shots he

14   ran away.  He did not comment to anyone prior to the homicide that he wanted revenge for the

15   broken window.  No one thought the person who broke the Thunderbird's window was a Bulldog

16   gang member.

17          On the evening of October 12 he went to another party.  He participated in two trips to steal

18   beer.  He smoked some PCP and then "blacked out."  He does not remember anything else that

19   happened during the night of October 12 or the early morning hours of October 13.

20          Petitioner said he woke up at 6:30 or 7:00 a.m. on October 13th at his cousin's house.  Torres

21   "told me that he had shot a dog."  Petitioner asked Torres what he was talking about.  Torres replied,

22   "don't worry about it.  Anyways, you were all messed up."  Later that day, Torres told him that they

23   went to the house where the person who broke the window lived and "got him."  Torres also said he

24   had "messed up, that he needed to leave the country."  Later, Petitioner asked a cousin "if he could

25   give [Torres] a ride because he had done a shooting."  Torres did not say anything in response to

26   Petitioner's comment.

27          Petitioner said he arrived at Rocha's apartment on the night of October 19 wearing an old,

28   broken pair of sandals.  Rocha's brother lent him a pair of shoes.

1    Petitioner has numerous gang related tattoos.  It was stipulated that he attended two sessions

2    at a tattoo removal clinic.  Petitioner admitted having a tattoo with a Spanish phrase on his chest.

3    Petitioner translated the phrase as "I will die for my family.  I will kill for Surenos trese."  He said he

4    tried to have this tattoo removed but the tattoo removal clinic only removed visible tattoos.

5    Petitioner denied making any incriminating statements about the shooting.

6                                           **DISCUSSION**

7    **I.  Jurisdiction**

8    Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant

9    to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of

10   the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362,

11   375 n.7 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S.

12   Constitution.  In addition, the conviction challenged arises out of the Fresno County Superior Court,

13   which is located within the jurisdiction of this court.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(d).

14   Accordingly, the Court has jurisdiction over the action.

15   On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of

16   1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment.

17   Lindh v. Murphy, 521 U.S. 320 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997),

18   *quoting* Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir. 1996), *cert. denied,* 520 U.S. 1107 (1997),

19   *overruled on other grounds by* Lindh v. Murphy, 521 U.S. 320 (1997) (holding AEDPA only

20   applicable to cases filed after statute's enactment).  The instant petition was filed after the enactment

21   of the AEDPA; thus, it is governed by its provisions.

22   **II.  Legal Standard of Review**

23   This Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody

24   pursuant to the judgment of a State court only on the ground that he is in custody in violation of the

25   Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

26   The instant petition is reviewed under the provisions of the Antiterrorism and Effective Death

27   Penalty Act which became effective on April 24, 1996.  Lockyer v. Andrade, 538 U.S. 63, 70 (2003).

28   Under the AEDPA, an application for habeas corpus will not be granted unless the adjudication of

1  the claim "resulted in a decision that was contrary to, or involved an unreasonable application of,

2  clearly established Federal law, as determined by the Supreme Court of the United States" or

3  "resulted in a decision that was based on an unreasonable determination of the facts in light of the

4  evidence presented in the State Court proceeding."  28 U.S.C. § 2254(d); see Lockyer, 538 U.S. at

5  70-71; see Williams, 529 U.S. at 413.

6       As a threshold matter, this Court must "first decide what constitutes 'clearly established

7  Federal law, as determined by the Supreme Court of the United States.'"  Lockyer, 538 U.S. at 71,

8  quoting 28 U.S.C. § 2254(d)(1).  In ascertaining what is "clearly established Federal law," this Court

9  must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time

10  of the relevant state-court decision."  Id., quoting Williams, 592 U.S. at 412.  "In other words,

11  'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set

12  forth by the Supreme Court at the time the state court renders its decision."  Id.

13       Finally, this Court must consider whether the state court's decision was "contrary to, or

14  involved an unreasonable application of, clearly established Federal law."  Lockyer, 538 U.S. at 72,

15  quoting 28 U.S.C. § 2254(d)(1).  "Under the 'contrary to' clause, a federal habeas court may grant

16  the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a

17  question of law or if the state court decides a case differently than [the] Court has on a set of

18  materially indistinguishable facts."  Williams, 529 U.S. at 413; see also Lockyer, 538 U.S. at 72.

19  "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court

20  identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies

21  that principle to the facts of the prisoner's case."  Williams, 529 U.S. at 413.

22       "[A] federal court may not issue the writ simply because the court concludes in its

23  independent judgment that the relevant state court decision applied clearly established federal law

24  erroneously or incorrectly.  Rather, that application must also be unreasonable."  Id. at 411.  A

25  federal habeas court making the "unreasonable application" inquiry should ask whether the state

26  court's application of clearly established federal law was "objectively unreasonable."  Id. at 409.

27       Petitioner has the burden of establishing that the decision of the state court is contrary to or

28  involved an unreasonable application of United States Supreme Court precedent.  Baylor v. Estelle,

1   94 F.3d 1321, 1325 (9th Cir. 1996).  Although only Supreme Court law is binding on the states,

2   Ninth Circuit precedent remains relevant persuasive authority in determining whether a state court

3   decision is objectively unreasonable.  See Duhaime v. Ducharme, 200 F.3d 597, 600-01 (9th Cir.

4   1999).

5        AEDPA requires that we give considerable deference to state court decisions.  The state

6   court's factual findings are presumed correct, 28 U.S.C. § 2254(e)(1), and we are bound by a state's

7   interpretation of its own laws.  Souch v. Schaivo, 289 F.3d 616, 621 (9th Cir. 2002), cert. denied,

8   537 U.S. 859 (2002), rehearing denied, 537 U.S. 1149 (2003).

9   **III.  Review of Petitioner's Claim**

10       Petitioner argues that his rights were violated when the jury was allowed to hear evidence of

11  statements made to police by a co-defendant whom Petitioner did not have the opportunity to cross-

12  examine.

13       This claim was presented in an appeal to the California Court of Appeal, which affirmed the

14  judgment in a reasoned opinion.  (Lodged Docs. 1-3.)  The issue was then raised in a petition for

15  review to the California Supreme Court, which summarily denied review.  (Lodged Doc. 4.)  The

16  California Supreme Court, by its "silent order" denying review, is presumed to have denied the

17  claims presented for the same reasons stated in the opinion of the lower court.  Ylst v. Nunnemaker,

18  501 U.S. 797, 803 (1991).

19       In rejecting Petitioner's claim, the Court of Appeal found that the error in allowing the jury to

20  hear the statements of Petitioner's co-defendant was harmless beyond a reasonable doubt.  The court

21  explained that the statements were cumulative of other reliable evidence showing Petitioner's guilt

22  and that Petitioner's unconsciousness defense was not believable.  (Lodged Doc. 3 at 50-52.)

23       The Confrontation Clause bars admission of out-of-court testimonial statements made by a

24  witness unless the defendant has had a prior opportunity to cross-examine the witness and the

25  witness is unavailable to testify at trial.  Crawford v. Washington, 541 U.S. 36, 53-54, 68 (2004).

26  The Supreme Court has not comprehensively defined "testimonial," but it has stated that "it applies

27  at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial;

28  and to police interrogations."  Id. at 68.

1    Violations of the Confrontation Clause are subject, however, to harmless error analysis as set

2    forth in *Chapman*.  See, e.g., Lilly v. Virginia, 527 U.S. 116, 139-40 (1999); Delaware v. Van

3    Arsdall, 475 U.S. 673, 684 (1986); see also Chapman v. California, 386 U.S. 18, 24 (1967)

4    ("[B]efore a federal constitutional error can be held harmless, the court must be able to declare a

5    belief that it was harmless beyond a reasonable doubt.").  Further, "[t]o grant relief where a state

6    court has determined that a constitutional error was harmless, we must both determine (1) that the

7    state court's decision was 'contrary to' or an 'unreasonable application' of Supreme Court harmless

8    error precedent, and (2) that the petitioner suffered prejudice under *Brecht* from the constitutional

9    error." Inthavong v. Lamarque, 420 F.3d 1055, 1059 (9th Cir. 2005); see also Brecht v.

10    Abrahamson, 507 U.S. 619, 637-38 (1993) (stating that prejudice occurs where an error "had

11    substantial and injurious effect or influence in determining the jury's verdict").  "Since both the

12    *Brecht* and the AEDPA/*Esparza* tests must be satisfied with respect to harmless error before relief

13    can be granted, we are not obliged to address them in any particular order."  Inthavong, 420 F.3d at

14    1061.

15    Here, as found by the Court of Appeal and effectively conceded by Respondent, Mr.

16    Calderon's October 25, 1999 interview was testimonial in nature as it took place with Detective Von

17    Euw after Calderon was arrested.  See Crawford v. Washington, 541 U.S. 36, 68 (2004).  Further,

18    there is no dispute that Calderon was unavailable to testify at trial and that Petitioner did not have a

19    prior opportunity to cross-examine him.  (See RT at 4804.)  The trial court therefore erred when it

20    allowed the prosecutor to utilize Calderon's statements implicating Petitioner.

21    However, the state court's determination that the error was harmless was not unreasonable, as

22    Calderon's statements were cumulative of other evidence in the record that convincingly

23    demonstrated Petitioner's guilt.  Calderon, in the statements in question, stated that Petitioner and

24    Torres woke him up and that Petitioner asked him for a gun.  After Calderon retrieved a gun for

25    Petitioner, they drove to the victim's home and Petitioner entered the house.  Calderon and Torres

26    waited outside.  Calderon did not hear gunshots prior to leaving the scene.  (CT at 967-977.)

27    Torres similarly testified that Petitioner woke up Calderon and asked him for a gun, which

28    Calderon retrieved.  Petitioner then gave Calderon directions to the victim's house and the group

arrived in a nearby alley.  Petitioner exited the vehicle and entered the house while Torres and Calderon remained outside.  Torres heard two or three gunshots before Petitioner returned to the car. Petitioner stated that "he got him in the head."  (RT at 2039-53, 2057-63, 2066-69.)

Other witnesses also gave testimony pointing to Petitioner as the shooter.  Juan Carlos Santa Maria testified that Petitioner told him that he wanted to find a gun and retaliate against Arcadio and that Petitioner would take the blame for whatever happened if others would help him.  (RT at 1127-33, 1138, 1146-47, 1158.)  A criminalist testified that a partial shoe print found in the victim's backyard was consistent with a pair of shoes found by detectives near Petitioner's clothing when he was arrested.  (RT at 3706-09, 3713-15, 3721-23, 3756-61.)

Ruth Huizar testified that she saw Petitioner, Torres, and Calderon together shortly before the shooting.  (RT at 1013-19, 4940-41.)  She further stated that, during a telephone conversation after the murder, she heard Petitioner urging Torres to tell her to lie about their actions the night of the murder.  Huizar also heard Petitioner say that "he just went in and just did everything without thinking" and that "he didn't mean to kill a little boy."  (RT at 1019-22, 1030-31.)

Detective Von Euw testified that Lorenzo Salas, Petitioner's former cell mate, told him that Petitioner admitted shooting the victim two or three times in the head with a .25-caliber pistol.  (RT at 4248-50.)  Detective Von Euw also testified that Ricardo Nunez told him that Petitioner admitted shooting the victim, but claimed he did not realize who it was because the victim's head was covered by a blanket.  (RT at 4241.)

There was also significant evidence contradicting Petitioner's unconsciousness defense. During Petitioner's police interview, he claimed that he knew "[n]othing at all" about the shooting and that he spent the entire evening at a friend's house on the west side of Fresno.  (RT at 3943, 3958-60.)  He never claimed that he lost consciousness and he specifically recalled that several of his friends were arrested while traveling with Ruth Huizar.  (RT at 3958.)  Further, Ricardo Nunez testified that Petitioner did not appear to be drunk or high when he came to wake up Calderon shortly before the shooting.  (RT at 1079.)  Christella Ochoa and Miguel Coronado stated that, shortly after the shooting, Petitioner looked "nervous" or "jumpy, like something was wrong."  (RT at 1414-19,

1503-04.)  Coronado further testified that, while he was riding with Petitioner shortly after the shooting, Petitioner told him not to say anything and to claim he did not know anything if the police pulled them over.  (RT at 1422-28.)

The overwhelming evidence demonstrating Petitioner's guilt and contradicting his unconsciousness defense made it reasonable for the state court to conclude that the error in allowing Calderon's statements into evidence was harmless beyond a reasonable doubt.  For the same reasons, Petitioner has not shown that the use of Calderon's statements had a substantial and injurious effect or influence in determining the jury's verdict.

**RECOMMENDATION**

Accordingly, the Court RECOMMENDS that the petition for writ of habeas corpus be DENIED WITH PREJUDICE and the Clerk of Court be DIRECTED to enter judgment for Respondent.

This Findings and Recommendation is submitted to the Honorable Anthony W. Ishii, United States District Court Judge, pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Rule 72-304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within thirty (30) days after being served with a copy, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation."  Replies to the objections shall be served and filed within ten (10) court days (plus three days if served by mail) after service of the objections. The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636(b)(1)(C).  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).


IT IS SO ORDERED.

**Dated:     November 10, 2008              /s/ John M. Dixon**

UNITED STATES MAGISTRATE JUDGE